Not what was envisioned 25 years ago in the servicing guidelines. The fifth case for this morning is Diedrich v. Ocwen Loan Servicing. Mr. Pagel. Good morning, your honors. May it please the court. I represent Daniel and Natalie Diedrich, who have sent me to this court to request that a jury be allowed to listen to their complaints about emotional distress and other harm caused by Ocwen's refusal to honor federal and state law, rather than having those damage determinations made on paper by a magistrate judge who never met these people in person, who never listened to them testify, could never consider the full range of emotion displayed by that. Well, of course, it's true that when ruling on summary judgment, you know, a district court has to take the facts in the light most favorable to the non-moving party, but it only has to accept those facts about which the non-moving party has personal knowledge. Speculation as to others' motivations is never, it's just never enough. So what personal knowledge did the Diedrichs have that they were denied loans or not given credit because of anything that Ocwen, I hope I'm pronouncing that correctly, did? I think there's two things that you need to look at there. First, both Daniel and Natalie Diedrich testified that they had been denied loans and were afraid to apply for loans based on inaccurate credit reports, and Natalie Diedrich was very clear about her conversations with Ocwen in which she asked them whether they were reporting it accurately and complained about reports she had been seeing, and Ocwen at times told her it was reported accurately, at times told her it was not. Well, what she said, I think what she testified to, was that the family had trouble taking out loans since the implementation of the loan modification, and it seems to me that that would simply support the theory that the family was having trouble getting loans because of the foreclosure signaled by the loan modification rather than by the fact that Ocwen didn't respond, allegedly didn't respond properly to the Diedrich's letter. Well, you have to look at this in phases, and first what... But do we? I mean, I think maybe you can address this head-on, and Judge Romer just referred to it. The district court is of the view, if I'm reading it correctly, that the damages that the Diedrichs are asserting need to be linked to the violation itself here, which was the failure to respond to this general request for information about the loan, who's servicing it, and all the rest of these things, that we all agree was a problem. So the district court rejects the idea that a global... the day we got this mortgage kind of statement is good enough, that there needs to be some focus. So you either need to argue that that focus isn't necessary, you don't have to focus on the precise violation, or you have to show us somewhere in the record where they tie a loan or emotional damage to the fact that this one flaw in the process has occurred. Certainly. Let me address the causation question, which is what I think the court is getting at here. Magistrate Joseph found that even if these damages were believed, there was no causal link to the qualified written request lack of response. And under the state law, which was the second aspect of the claim under Chapter 224, the causation is actually less than would be required under the RESPA 2605, and this court's precedent in Catalan. So I'd like to address that very briefly. Wisconsin allows litigants who are aggrieved to make a claim for either actual damages under Section 224.80 of the Wisconsin statutes, or statutory damages. And the state has defined aggrieved as a violation of rights. That's in the Leibovich case that's been cited by both sides, I believe. I say an aggrieved party is one having an interest, et cetera, which is injuriously affected by the judgment. And so the district court thought that when all was said and done, both RESPA, both the federal law and the Wisconsin law, require actual damages of some kind. They can be emotional. They can be, you know, monetary. You know, you had to pay 10% for your loan, and if they hadn't done it, could have gotten it for 7%. That's fine. That's obviously monetary. But that doesn't get to the focus question that I'm trying to get you to address. So what is it about this qualified written request that caused either of the Diedrichs? If you look at the testimony from Dan and Natalie Diedrich following the modification, what they testified to is that they were reported and AQUIN was telling them that they were paying 9.64% interest, that they had their escrow fluctuate up and down, and at one point there was a $5,000 payment made, and their escrow payments were actually being increased. When they contacted AQUIN, they were told that litigation expenses were billed to them, despite the modification preventing that. And so from July of 2011 through February of 2013, the Diedrichs were attempting to correct these errors on their own. But that's not the failure of AQUIN to answer the qualified written request, which I assume was submitted perhaps to lay the groundwork for whatever claims might come along, but it looked like a pretty general request to me. Well, I think if you look at the actual request, it asks for information specifically pertaining to the problems that Daniel and Natalie Diedrich were having. They were getting conflicting reports about how their loan was being reported, that it wasn't being paid properly, and they were getting reports from AQUIN that money was being applied from their suspense account to escrow and to litigation fees, which would then support the inference that those are not being supplied to the principal and interest payments. So the qualified written request was designed to provide them information that would show either that the payments had been inaccurately applied, and then they could correct those with AQUIN, or that their credit shouldn't have been dinged and that the payments were applied to their principal and interest, which would allow them in confidence to go to lenders. And I think that's where the causal link really comes in. The district court and AQUIN certainly focused on whether there was sufficient proof of denials of loans, and I think Natalie's testimony in particular is that from the request forward they were afraid to apply for loans, and she testified specifically that there were denials. But if you look at the emotional distress component... But she's not specific. She doesn't say, We applied, you know, on February 10th for this loan, and we were turned down. Well, with all due respect, I don't think that that level of specificity is required to survive summary judgment. The detractors didn't move for summary judgment. I'm not sure that's correct. But there was more specific testimony about the emotional distress, and that was the key element. Both Dan and Natalie testified that initially they believed their emotional distress damages rose to the level of a quarter million dollars. At their deposition they testified that they would have been satisfied with $100,000, and that's a measure of how distressed they felt. Look, they never sought medical care, mental health care. The way they described the stress was being due to, quote, everything that AQUIN did and the litigation. They present no argument that the stress was from AQUIN's failure to properly respond to their requests as required by the statute, rather than AQUIN's action in initiating foreclosure. If every person who filed a suit could claim emotional distress from the ensuing litigation, well, I don't know. We'd be here 24-7. Well, they're not describing distress from the litigation itself. When you look at the totality of their testimony, under Catalan and under in-rate residential capital and pain versus poly, the cases we cited, the level of testimony and specificity about emotional distress is relatively nominal to get past summary judgment. In Catalan, the plaintiffs described their testimony as nervous, shaky, embarrassed, can't sleep, don't want the doorbell to ring. They were describing in general fears they had that would be both attributable to foreclosures and financial troubles as well as an inability to comprehend their situation. And what Dan and Natalie testified to was after a year and a half of trying to deal with this on their own, they had an attorney help write a letter that were designed to answer these questions and Natalie specifically described part of her component of distress as having to have an attorney on call every day. She talked about at her deposition, she was asked, what is the basis for the amount you asked for in disclosures? And she said the basis is everything that AQUIN has put us through over the three years of this lawsuit. Now, that's in 2014. The lawsuit hadn't existed for three years. What had been going on for three years were the problems. Right. But at that point, at least a year and a half had elapsed from the failure to answer. Now, she also testified, I'm sorry. You need to wrap up because you're talking so much. I'm sorry. I think the evidence here was sufficient to allow this to go to a jury and we think that the magistrate judges simply interpreted it in a way that left it falling short. Okay. Thank you very much. Who's Edling? Good morning. May it please the Court. I'm Emily Edling representing AQUIN Loan Servicing. I think on appeal, both parties and certainly this Court has recognized that the appropriate standard on appeal and for the district court below is to view the appellant's evidence in the light best for the appellant and to allow reasonable inferences. This circuit has routinely recognized that there are limitations on the generosity of review of the plaintiff's evidence. Those limitations are, one, that the evidence must be more than vague and conclusory, and two, that it must be such that a reasonable jury could actually find in favor of the plaintiff. How do you think a borrower could demonstrate damages from failure to respond to a qualified written request? I think there's examples from the briefing. One of the examples is in Catalan itself where there were numerous qualified written requests that they said were RESPA violations, and one of the RESPA violations at issue was whether there had been negative credit reporting within 60 days of the QWR. So in that case, there was this argument that you negatively reported the credit, you didn't investigate and look into it when I sent you a QWR, and because of that, I was damaged by the continued negative credit reporting. Another example is in... Before you carry on to the other example, here's at least a question I have. There's very clear testimony, certainly from Mrs. Diedrich, that she suffered from emotional distress. Forget about the number she puts on it because that's something that Rule 54 says. In any event, if she was too low, she'd be entitled to more. If she's too high, she'd be entitled to less. So she says it's from everything, but actually the failure to respond, the violation of the law to the qualified written request, is a part of everything. So why shouldn't we say, look, she testifies very clearly that each and every one of the things that AQUIN did was causing her distress. She can go to trial. At trial, the court might focus her and maybe $250,000 or $100,000 is too much, but maybe she gets $1,000 for her request for her emotional distress, for the phase when she finally thinks she's got things under control. She sends this qualified written request, and she's ignored by AQUIN. So in other words, why is this not actually enough to allow her on a full trial to present this claim? Partly because it's so vague and conclusory. But how can you be anything but conclusory when you say I was suffering emotionally? Well, I think that the Catalan case provides another example, because in there there's ample discussion of the types of emotional distress. They talk about different symptoms of emotional distress, how it impacted the family. She talks about how it impacted the family. She can't get loans to help her children through college. She's constantly on the phone with the lawyer, relationship troubles, missing work. So I think we have – I would posit that that is fairly vague, a couple lines of testimony. But I think the bigger, more convincing issue is the lack of a causal link. The fact that she testified that everything is what has caused her emotional distress, she later in that deposition clarifies everything means everything that she's been through in the three years of the litigation. That's actually testimony that her emotional distress was caused by the litigation and not necessarily the QWR. She also, her testimony very clearly focuses on financial issues resulting from not being able to get loans, which I think led to – it's unclear why they can't afford to help their kids with college, unclear why they can't fix their house, but it seems to be all tied into this idea that they couldn't get loans. And she thinks that's Ocwen's fault. And I understand what you're saying, that maybe it really was the process that began with the foreclosure and actually got renegotiated and things moved on. And I gather Ocwen's position is that they are, in fact, current on their loans. Is that correct? There's no evidence that they weren't. The record doesn't say that they weren't current. And you're right, Your Honor, that there's also testimony that her distress was caused by negative credit reporting apparently from the 2010 foreclosure. Now, I don't know if that existed or not, but that testimony indicates it wasn't the distress from the QWR. But I think the final nail in the coffin of this argument is if you look at – there's only one RESPA violation and Wisconsin statute violation at issue, and that is the April 22, 2013 response to that February 22 QWR. That response the district court held was inadequate. Now, that February QWR does not discuss credit reporting. It doesn't mention it or ask any questions about it. All it asks is about their escrow and their interest rate. So there's no way that a response to that QWR could have been expected to address or change any issues regarding credit reporting. She may have testified, I think vague and conclusorily, that she has been stressed out by everything including the QWR, but there's no causal connection between the credit reporting and the stress over not having money from loans and this QWR. And that leads me – also that ties into the second example that I was going to give, Your Honor, about how you might prove that you were stressed by a QWR. It's actually a case cited in Appellant's brief, the In Re Residential Capital LLC case. It's a bankruptcy case out of New York where there was an objection to the claim, and basically the court analyzed whether there could be a RESPA violation and proof of damages and causation based on a failure to respond to a QWR. In that case, there had been a foreclosure, which the bank had said that it was an error and they were going to stop it. The plaintiff wrote a QWR saying, You haven't stopped this foreclosure yet. What's going on? And the court specifically said, If the bank had done what it should have in responding to that QWR, it would have investigated why its attorney was still doing a foreclosure. And the court said it would have fired that attorney and stopped the dismissal. So there is an example of how not responding to a QWR can lead to continued damages from this litigation that never should have happened and understandably emotional distress. In this case, the only damage other than emotional distress is this allegation that they were basically short on money because of the inability to obtain loans, which we contend, as I mentioned, is very vague and conclusory compared to the specific examples of loan denials. What about their allegation that they had the failure to respond to the QWR force them to hire a lawyer and incur a lot of expenses they would not have perhaps otherwise had? And we say at least one case in the briefing, I can't remember the name, that that's inadequate. If having to hire a lawyer and then being involved in the litigation was your damages for proof of a claim, then there would always be a claim. The RESPA statute does allow attorney's fees if you prevail. So it makes sense that attorney's fees can't be part of your damages in proving the actual claim. So, Your Honors, I wanted to mention the alleged misconduct issue and focus on the fact that there's only one. I've done that. Talk about the causal connection. Your Honors have already discussed that. At length with Appellant's Counsel, there's the suggestion in the briefing that the Catalan case allows the causal relationship to not be so direct. And it's pretty vague, actually, in Catalan, it seems to me. In Catalan, I think, first of all, a huge difference between Catalan was the number of RESPA violations. There were about five different cases. Why does that go to the clarity of the emotional distress as opposed to the number of sources that might have caused it? I mean, you could suffer terribly from one ghastly event, or you could suffer because there were five or six events. But the question is, did you suffer anything? It seems you are the one who would be the focus, not the number of events that caused it. I agree, but I think the court had more events to consider when trying to determine whether or not there had been anything that had disturbed them. Here we have one, and so we just have to look more closely at this one and see how could it reasonably have caused stress, especially in light of everything that they've claimed they were stressed about, the foreclosure, the inability to obtain loans, which had nothing to do with this QWR response. But they've essentially testified that they were not stressed out about this QWR response because they were stressed out because they attribute their stress to other things. And the Catalan case does not support this idea that there doesn't need to be a direct causal link. In that case, I think it's significant. There are so many issues that it kind of makes sense in the end that the court refers to reference to mortgage issues as being a reason why loans were denied because there were five different QWRs. There were different claims for RESPA violations that specifically had to do with credit reporting, which is very different than this case where the QWR issue doesn't have anything to do with credit reporting. Thank you. I see my time is up. Thank you. Thank you very much. Mr. Pegley, your time expired, but if you'd like one minute, I will let you respond. Asked at her deposition, why did you decide to file a lawsuit against AQUIN? Natalie said they were unable to provide me with any of the answers I requested. Follow-up question, what harm do you believe you suffered due to AQUIN's actions? She asked for specificity. They said, what is your injury as a result of AQUIN's actions? She said, they've harmed my ability to take out any loans. They've ruined my chances of helping my kids through college. My credit destroyed. Multiple financial burden, the whole having the legal issues, the stress of dealing with this every single month. Asked, that was prior to the loan modification and prior to the foreclosure action. Is that correct? No, Natalie Diederich answered. She did not limit her testimony to the foreclosure case. In rest cap, the court said the party at trial would have to separate out the emotional distress caused by the failure to respond properly from the foreclosure itself. In Catalan, the plaintiffs described what they called increased stress from the housing situation, failing to differentiate between the foreclosure problems and the QWR. In the Rawlings case, we cited $115 in postage and the answer, oh yeah, I get real upset about that, were deemed sufficient to proceed to trial. Here, there's no doubt that Natalie Diederich incurred costs, had an attorney, and suffered distress, which she testified to. All right. Thank you very much. Oh, excuse me. No, thank you. Thank you very much. We will take the case under advisement.